J-S50027-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 2396 EDA 2016 |
| KAREEM JOHNSON | : | |

Appeal from the PCRA Order July 11, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0400722-2004

BEFORE:   PANELLA, J., RANSOM, J., and PLATT*, J.

MEMORANDUM BY PANELLA, J.                    **FILED JANUARY 09, 2018**

The Commonwealth of Pennsylvania appeals the order entered in the Philadelphia County Court of Common Pleas granting the discovery motion of Appellee, Kareem Johnson in connection with his petition filed under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. The order directed the Commonwealth to produce the Philadelphia Police department's investigative homicide file for an *in camera* review. We affirm.

The relevant facts and procedural history of this case are as follows. On April 28, 2006, following a first-degree murder conviction, Appellee was sentenced to life without parole. On direct appeal, this Court affirmed Appellee's sentence and the Pennsylvania Supreme Court denied *allocator*. Appellee filed a timely PCRA petition, which the PCRA court permitted to be amended multiple times over the course of several years. In May 2015,

_____
*   Retired Senior Judge assigned to the Superior Court.

Appellee filed a motion for discovery pursuant to the PCRA. The Commonwealth objected, citing the extreme delay in Appellee's motion and the lack of exceptional circumstances as required for an order of discovery under the PCRA. After several hearings on the motion, the PCRA court granted Appellee's motion and ordered the Commonwealth to deliver the police file from the homicide investigation to its chambers for an *in camera* review of its contents. The Commonwealth filed a timely motion to reconsider, through which it raised, for the first time, its claim that the PCRA court's discovery order violated its investigative privilege. The PCRA court denied the motion. This timely appeal follows.

Prior to addressing the merits of the Commonwealth's appeal, we must first address Appellee's allegation that the order before us is a non-appealable interlocutory order. *See* Appellee's Brief, at 1-5. The Commonwealth argues the order is immediately appealable as an order overruling an assertion of privilege. *See* Commonwealth's Brief, at 1-3.

An order is appealable, and thus subject to our review, if it is final, interlocutory and appealable by right or permission, or collateral. *See Commonwealth v. Kennedy*, 876 A.2d 939, 943 (Pa. 2005). *See also* 42 Pa.C.S.A. § 702(b); Pa.R.A.P. 311-313, 1311-12. Neither party contends the order in question is a final order (It obviously is not.), and the trial court denied the Commonwealth's request to certify its appeal as interlocutory by permission. Thus, we may only review the order if we find it to be a collateral order.

An appeal from a collateral order may be taken as of right where the order is separable from and collateral to the main cause of action, the right involved is too important to be denied review, and the question involved is such that if review is postponed, the claim will be irreparably lost.

*Kennedy*, 876 A.2d at 943 (citing Pa.R.A.P. 313).

"This court has held that discovery orders involving privileged information are ... appealable as collateral to the principal action pursuant to Pa.R.A.P. 313." *Commonwealth v. Makara*, 980 A.2d 138, 140 (Pa. Super. 2009) (citation and internal quotation marks omitted). Thus, ordinarily, we would have found that the discovery order involving privileged information would be appealable as a collateral order. But, as the Appellee argues, *see* Appellee's Brief, at 1-3, the Commonwealth failed to assert a claim of privilege prior to the entry of the discovery order, thus it cannot claim jurisdiction under this particular legal principle. While we agree with the Appellee that the Commonwealth's failure to properly assert its claimed privilege precludes its reliance on this rule of law, we nonetheless find that the order is appealable as a collateral order.

The discovery order here is clearly separable from the issue of whether Appellee is entitled to a new trial under the PCRA. Further, in a case with a similar fact pattern, *Commonwealth v. Frey*, 41 A.3d 605, 609 (Pa. Super. 2012), we found that the "issue of whether the Commonwealth must disclose material related to an ongoing murder investigation implicates rights deeply embedded in public policy." We see no reason why this case would have any

less impact on public policy rights, and thus find the right too important to be denied review. Finally, if appellate review was postponed, the Commonwealth would be required to immediately disclose the police's investigative file—and any later ruling finding that disclosure was improper would be moot. Thus, we find that the discovery order in question is a collateral order, properly presented for our review.

Moving to the issues raised on appeal, the Commonwealth contends the PCRA court erred in ordering an *in camera* review of the police's investigative homicide file. **See** Commonwealth's Brief, at 5, 19-36. Specifically, the Commonwealth alleges this discovery order was entered in violation of the PCRA mandate of finding "exceptional circumstances" prior to ordering discovery and of the Commonwealth's investigative privilege. **See id**.

> In PCRA proceedings, discovery is only permitted upon leave of court after a showing of exceptional circumstances. 42 Pa.C.S.A. § 9545(d)(2); Pa.R.Crim.P. 902(E)(1). The PCRA and the criminal rules do not define the term "exceptional circumstances." Rather, it is for the trial court, in its discretion, to determine whether a case is exceptional and discovery is therefore warranted.
>
> We will not disturb a court's determination regarding the existence of exceptional circumstances unless the court abused its discretion. An abuse of discretion is not a mere error in judgment. Instead, it is a decision based on bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law. Moreover, we recall that the appellant has the duty to convince us an abuse occurred.

**Frey**, 41 A.3d at 611 (some internal citations omitted).

- 4 -

We have reviewed the briefs of the parties and the certified record pursuant to this standard, and conclude that the opinion authored by the Honorable Teresa M. Sarmina ably addresses the issues raised by the Commonwealth on appeal. *See* Trial Court Opinion, 12/20/16, at 9-24. We therefore adopt its cogent reasoning as our own, and affirm on that basis.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/9/18

**PHILADELPHIA COURT OF COMMON PLEAS**
**CRIMINAL TRIAL DIVISION**

COMMONWEALTH             :

            :     **CP-51-CR-0400722-2004**

v.

CP-51-CR-0400722-2004 Comm. v Johnson, Kareem
Opinion

**KAREEM JOHNSON**


7880057541

**FILED**

Sarmina, J.
December 20, 2016

DEC 2 0 2016

OPINION

Criminal Appeals Unit
First Judicial District of PA

## PROCEDURAL HISTORY:

On March 16, 2006, following a bench trial[1] before the Honorable Jane Cutler Greenspan, Kareem Johnson (hereafter, petitioner) was convicted of murder of the first degree (H-1), aggravated assault (F-1), carrying a firearm without a license (VUFA) (F-3), criminal conspiracy (F-1), and possessing instruments of crime (PIC) (M-1).[2] On April 28, 2006, following receipt and review of pre-sentence and mental health reports, the trial court imposed a sentence of life imprisonment without parole for the first degree murder conviction.[3] On May 11, 2006, petitioner filed a post-sentence motion for relief which was denied by the trial court on July 5, 2006. On October 18, 2007, Superior Court affirmed petitioner's judgment of sentence.[4] On May 14, 2008, our Supreme Court denied *allocatur*.[5]

---

[1] Petitioner was tried alongside co-defendant Kennell Spady.

[2] 18 Pa.C.S. §§ 2502, 2702, 6106, 903, and 907(a), respectively.

[3] As to the conviction for aggravated assault, petitioner was sentenced to a concurrent term of not less than ten nor more than twenty years in prison. As to the conviction for VUFA, petitioner was sentenced to a consecutive term of three and a half to seven years in prison. As to the conviction for criminal conspiracy, petitioner was sentenced to a consecutive term of twenty to forty years in prison. As to the conviction for PIC, petitioner was sentenced to a concurrent term of one to five years in prison. Trial Court Opinion, 7/13/06, at 1-2.

[4] Commonwealth v. Johnson, No. 1892 EDA 2006, slip op. (Pa.Super., Oct. 18, 2007) (memorandum opinion).

[5] Commonwealth v. Johnson, No. 604 EAL 2007, slip op. (Pa. May 14, 2008).

On October 8, 2008, petitioner filed a petition pursuant to the Post-Conviction Relief Act (PCRA),[6] *pro se*. This matter was assigned to this Court on August 25, 2009.[7] On September 11, 2009, Michael Gonzales, Esquire and Amy Donella, Esquire, of the Federal Community Defender Office, appeared before this Court as counsel for petitioner and requested additional time to file an amended PCRA petition. Following several continuances, petitioner filed an amended petition on February 19, 2014, and an appendix thereto on July 18, 2014. On January 29, 2015, the Commonwealth filed a Motion to Dismiss.

On May 18, 2015, petitioner filed a Motion for Discovery, seeking 121 categories of information from the case file in the Commonwealth's custody and control. On May 20, 2015, petitioner filed a response to the Commonwealth's Motion to Dismiss and the Commonwealth filed a response objecting to the discovery request. Following additional filings, this Court heard argument on the discovery request on July 2, 2015.[8] In discussing the defense's discovery request at the hearing, the Court made clear to counsel that, pursuant to Pa.R.Crim.P. 902(E)(1)[9], the burden was on the defense to demonstrate "exceptional circumstances" before the Court could grant the discovery request. With respect to exceptional circumstances, defense counsel asserted the existence of several documents and items of evidence which should have been, but were not, provided to the defense prior to trial, including: 1) a police activity sheet indicating that Jerome Broaster, one of the participants in the gun battle central to the case, had been interviewed by police and had apparently

---

[6] 42 Pa.C.S. §§ 9541-9546.

[7] Justice Greenspan had been appointed to the Pennsylvania Supreme Court on July 2, 2008.

[8] At the hearing, Amy Donella, Esquire, withdrew from representation, and Eric Montrose, Esquire, joined Mr. Gonzales as counsel for petitioner.

[9] This rule provides that, in a non-capital case under the PCRA, "…no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of exceptional circumstances." Though petitioner's case started out as a capital case, ultimately this case ended up being non-capital.

provided exculpatory information; and, 2) documents indicating that police had recovered ballistics and other evidence relating to the case from two separate automobiles which the police suspected may have been used by the Broasters in connection with the gun battle. Notes of Testimony (N.T.) 7/2/15 at 50-60. Defense counsel argued that this information was exculpatory in that it tended to support petitioner's self-defense defense at trial, and therefore, under Brady[10], the Commonwealth had an obligation to provide this evidence to the defense

Following additional filings on this issue, this Court heard additional argument on August 14, 2015. At this hearing, defense counsel represented that they had only been provided a property receipt referencing the vehicles recovered by police, but nothing else with respect to any evidence recovered from the vehicles. This Court found that any scientific or ballistics testing and all other evidence recovered from the two vehicles should have been provided to defense counsel prior to trial, and ordered the Commonwealth to provide this evidence to the defense. N.T. 8/14/15 at 65-67. The Commonwealth had also provided the defense with a statement by Rafi Smith[11] made in an interview with federal intelligence officer David Garroway on February 26, 2004; the Commonwealth had failed to provide the statement in pretrial discovery. Id. at 8/14/15, at 114. This Court ordered the Commonwealth to provide the defense with any other information provided by Rafi Smith, finding that this information should have been provided to the defense in pretrial discovery. Id. at 131.

This Court held a status hearing on January 8, 2016, in preparation for an evidentiary hearing to be held on January 26, 2016, on petitioner's claim that trial counsel had rendered ineffective assistance for failure to present the defense that petitioner had requested, namely that petitioner was

---

[10] Brady v. Maryland, 373 U.S. 83 (1963).

[11] Rafi Smith was an associate of petitioner's who has, at various times, admitted or denied his presence in the gun battle central to this case, and asserted the participation of other individuals in the gun battle.

not present at the gun battle. At the January 8, 2016 hearing, this Court also heard argument on the discovery motion and ordered the Commonwealth to search its files for any information with respect to whether Homicide detectives had interviewed Cassius Broaster or Rafi Smith, and further ordered the Commonwealth to search its files for any information with respect to the purported police interview of Jerome Broaster referenced in the police activity sheet. N.T. 1/8/16 at 31, 72-74.

At the evidentiary hearing conducted on January 26, 2016, in addition to hearing testimony on petitioner's claim for ineffective assistance of counsel for failing to present the defense that petitioner was not present at the gun battle, this Court heard testimony from Assistant District Attorneys (ADA) Mark Gilson, one of the trial prosecutors for this case, as to his reasons for not turning over the Rafi Smith statement to the defense in pretrial discovery. N.T. 1/26/16, at 202, 210-14. ADA Gilson testified that he did not turn the statement over because it indicated that petitioner was present at the scene, and therefore he did not consider it to be exculpatory material which he was obligated to provide the defense under Brady. Id.

On May 20, 2016, this Court denied petitioner's claim that trial counsel was ineffective for failure to present the defense that petitioner wanted, i.e., that he was not present at the gun battle, and ordered an evidentiary hearing on petitioner's claim that trial counsel was ineffective for failure to properly investigate and develop the self-defense defense that had been presented at trial against petitioner's wishes. N.T. 5/20/16, 9, 14. This Court also heard argument and averments by the defense that Detective Jack Cummings had testified before both a Grand Jury and at trial, and that trial counsel had never been told about Detective Cummings' testimony before the Grand Jury. N.T. 5/20/16 at 18-20. The Court ordered the Commonwealth to provide the defense the Detective Cummings' Grand Jury testimony, as well as any tapes or transcripts of emergency calls made to 9-1-1 on the day of the gun battle. N.T. 5/20/16 at 25, 52.

4

On July 11, 2016, petitioner renewed his earlier request for all items of discovery, arguing that the Commonwealth's failure to provide the evidence regarding the two vehicles, the Grand Jury testimony, the activity sheet referencing police contact with Jerome Broaster, and the Rafi Smith statement constituted exceptional circumstances which provided a basis for the Court to order the Philadelphia Homicide Division to produce its entire file from the investigation into the gun battle, so that defense counsel could determine whether all pertinent and exculpatory information had in fact been provided. N.T. 7/11/16 at 2-15. Over the objections of the Commonwealth, this Court found that the Commonwealth's pattern of failure to provide information in pretrial discovery which would have supported petitioner's self-defense defense showed exceptional circumstances warranting discovery of the Homicide investigation file pursuant to Pa.R.Crim.P. 902(E)(1). Id. at 28-42. Therefore, this Court ordered the production of that entire investigative file to the Court's chambers within two weeks, so that the file could be reviewed by this Court, defense counsel, and counsel for the Commonwealth for any information which fairly should have been provided in pretrial discovery.[12] Id. at 41-3. This Court further ordered that the Commonwealth should have no conversations with the Homicide detectives involved in the investigation with respect to these discovery matters. On August 2, 2016, the Commonwealth filed this timely appeal to Superior Court.

## FACTS[13]

Petitioner and Cassius Broaster were feuding for over five (5) years before the fatal gun battle central to this case. N.T. 3/14/06, at 60. In December of 2003, Cassius Broaster shot

---

[12] The Court indicated that it was willing to accommodate any of the Commonwealth's concerns with respect to the integrity of the Homicide investigation file and supervision of the review of the file. These concerns were not substantively addressed, as the Commonwealth instead elected to file this appeal.

[13] The facts are substantially as stated in Judge Greenspan's Pa.R.A.P. 1925(a) Opinion for petitioner's direct appeal, dated July 13, 2006.

5

petitioner. N.T. 3/8/06, at 310-11. Following his hospitalization, petitioner moved to 1912 South 17th Street, apartment 301, with Jean Reddick, a family member.[14] N.T. 3/10/06 at 132, 156-58. About two (2) days prior to the shooting of Faheem Thomas-Childs, these individuals again engaged in a shootout at 24th and Indiana Avenue. N.T. 3/14/06 at 61.

On the morning of February 11, 2004, co-defendant Kennell Spady, petitioner, and a third male, identified only as Chris, went to 23rd and Cambria Streets, near Thomas M. Pierce Elementary School, to meet Rafi Smith. N.T. 3/15/06, at 11. Smith was purportedly taking his child to school that day. N.T. 3/15/06, at 12. As these individuals met, Cassius and Jerome Broaster arrived in a Lincoln. Id. at 12. The Broasters got out of the vehicle and an argument ensued between the two groups. Id. The evidence presented at trial is unclear regarding the specific details of the subsequent gun battle that ensued.

Co-defendant Spady, in a statement given on February 14, 2004, claimed that Jerome Broaster and then Cassius Broaster first began shooting at the defendants. N.T. 3/15/06, at 12. A third individual, who was with the Broasters, began shooting as did co-defendant Spady and those with him. Id. In his statement, co-defendant Spady also admitted that he was armed with a .30 caliber carbine semi-automatic rifle and that Rafi Smith, Cassius Broaster, and Jerome Broaster were all armed with handguns. Id. at 16.

There was also evidence through a statement of the witness, Russell Brown, given on February 22, 2004, that following the argument between petitioner and Cassius Broaster, petitioner pulled out a pistol and ran up 23rd Street. N.T. 3/8/06, at 307. Mr. Brown subsequently heard shots being fired and took cover behind a car. Id. at 307-11. The statement provided by Mr. Brown further indicates that he also saw a male with a shotgun further up on 23rd Street. Id. at 312.

---

[14] Jean Reddick raised petitioner and also was involved in a relationship with petitioner's uncle. N.T. 3/10/06, at 132.

Kendra Sexton testified that she also saw two groups of males arguing. N.T. 3/14/06, at 85. During the argument one of the males was located near a garage and the other group of males was on the opposite side of the street by Peirce Elementary School. Id. at 85-88. Ms. Sexton further testified that she had told police in a statement taken on February 11, 2004, that the first group of males, that had been by the garage, had walked toward 23rd Street and then turned right onto 23rd Street. Id. at 98. Ms. Sexton also told police that a male from the second group then went to his car, retrieved a gun, ran in the direction of the first group and began shooting. Id. at 98-99.

Police Officer Eugene Frasier and his partner Officer Eunice Allen received a radio call at approximately 8:30 a.m. regarding the shooting and were the first to arrive on the scene. N.T. 3/8/06 at 5-6. Upon their arrival, they found a child bleeding from what appeared to be a gunshot wound over the right eye. Id. at 8-9. The child was lying in the entrance of the schoolyard of the Peirce Elementary School, located at 23rd and Cambria. Id. at 9. The young male, later identified as Faheem Thomas-Childs, was immediately taken to the emergency room at Temple University Hospital. Id. at 11-14, 17. Faheem Thomas-Childs was operated upon at Temple University Hospital but his condition deteriorated and on February 17, 2004 life support was disconnected. Id. at 93.

Police Officer Susan Ehrmann also responded to the scene of the shooting. N.T. 3/8/06, at 95. Upon her arrival, Officer Ehrmann found crossing guard Debra Smith who had sustained a bullet wound to her right foot. Id. at 98-99. Ms. Smith was taken to Temple University Hospital where she was treated. Id. at 93.

Police Officer Mark Williford was also called to the scene on February 11, 2004. N.T. 3/9/06, at 4-5. Officer Williford, along with several other officers, conducted a walk-through of the scene to document any physical evidence. Id. at 6. Officer Williford testified that because there was a tremendous amount of ballistics evidence at the scene and, due to the large size of the crime scene,

7

the situs was subsequently divided into three (3) smaller regions. Id. at 6-7. Twelve (12) pieces of ballistics evidence were recovered in the 2800 block of North 23rd Street from Somerset Street to Cambria Street. Id. at 15. Sixty-one (61) pieces of ballistics evidence were recovered in the 2900 block of North 23rd Street from Cambria Street to Indiana Avenue. Id. at 65-66. Fifty-six (56) pieces of ballistics evidence were recovered between the 2300 to 2500 blocks of Indiana Street. Id. at 207.

Police Officer Leonard Johnson, from the Firearms Identification Unit in the Philadelphia Police Department, processed the ballistics evidence recovered from the scene. N.T. 3/13/06, at 109-10. Officer Johnson testified to the positioning and identification of the various items recovered. Id. at 109-201. There were: (1) a total of twenty (20) fired cartridge casings from a .45 caliber semi-automatic handgun; (2) a total of twenty-seven (27) fired cartridge casings from a .30 caliber carbine semi-automatic rifle; (3) a total of eighteen (18) fired cartridge casings from a .9 millimeter SWD caliber firearm and three (3) fired cartridge casings from a .9 millimeter H caliber firearm; (4) a total of seven (7) fired cartridge casings from a .380 auto caliber firearm; and (5) a total of thirteen (13) fired cartridge casings from a .357. Id. at 129-71. Additionally, the bullet surgically removed from the head of Faheem Thomas-Childs was shot from a .45 caliber firearm and the projectile removed from the right foot belonging to Debra Smith was shot from a .9 millimeter firearm. Id. at 180-82, 188.

On the morning of February 14, 2004, Lieutenant Stephen Bennis, along with other members of the SWAT Unit, went to apartment 305 located at 1912 South 17th St. to serve both an arrest warrant for petitioner and a search warrant for that apartment. N.T. 3/10/06, at 3-4. After searching apartment 305, and after receiving information that petitioner could possibly be in apartment 301, several officers went to that location. Id. at 11-13. Lieutenant Bennis and the other officers knocked several times on the door of apartment 301 and announced their presence. Id. at

8

26-28. Finally, the officers were admitted into the apartment by Joseph Davis.[15] Id. at 28. Petitioner and co-defendant Spady were both found inside apartment 301 and they were both taken into custody. Id. at 30-33. A search warrant was then obtained for apartment 301 and both apartment 301 and 305 were searched. N.T. 3/10/06, at 96-98. Recovered in the search of apartment 301 under the mattress where petitioner was found was a Ruger .45 caliber semi-automatic handgun which was loaded with one chambered .45 caliber round and which also contained a magazine that contained eight (8) live .45 rounds. Id. at 98-100. This gun was determined by the ballistician to be the murder weapon. N.T. 3/13/06, at 158-59.

**LEGAL ANALYSIS:**

The Commonwealth raised the following issue on appeal:

**1. Whether the PCRA court erred in ordering discovery of the Commonwealth's entire investigative file in violation of the investigative privilege[16] and the discovery provision of the PCRA.[17]**

On appeal, the Commonwealth claims that this Court erred in granting petitioner's motion to order the production of the Homicide Division's investigation file, in its entirety, to the Court for

---

[15] Joseph Davis is the brother-in-law of Jean Reddick, who was the tenant of apartment 301. N.T. 3/10/06, at 15.

[16] The Commonwealth refers to the common-law "executive privilege" recognized in Commonwealth v. Kauffman, 605 A.2d 1243, 1246-48 (Pa.Super. 1992), and referenced in Ben v. Schwartz, 729 A.2d 547, 553 (Pa. 1999). Preliminarily, it is noted that the Commonwealth presented this argument for the very first time in its July 18, 2016 Motion to Reconsider this Court's ruling, and not at the July 11, 2016 hearing on this discovery motion. Even if we were to reach the merits, the Commonwealth's claim would fail, as these materials are not privileged: "Th[e executive privilege for information from government investigative files] is not absolute but qualified; and, when asserted, requires the court to balance the government's interest in ensuring the secrecy of the documents whose discovery is sought against the need of the private litigant to obtain discovery of the relevant materials in possession of the government." Kauffman, 605 A.2d at 1247. Further, it has been observed that "the great majority of cases that have considered the discoverability of law enforcement investigations have held that in general such discovery should be barred in ongoing investigations, but should be permitted when the investigation and prosecution have been completed." Id. Here, as the investigation and prosecution of petitioner's involvement in the fatal gun battle has been concluded for several years, the Commonwealth cannot demonstrate an interest in ensuring the secrecy of this information outweighing the need of petitioner to discover information which supports his claims for relief under the PCRA, particularly in light of the Commonwealth's pattern of withholding information that should have been provided in pretrial discovery as discussed *supra*. Therefore, this Court will not address this issue further

[17] This Court states the issue here as phrased in the Commonwealth's Rule 1925(b) Statement of Errors Complained of on Appeal, however, this phrasing is somewhat misleading. This Court's Order permitted discovery of only the Philadelphia Police Department Homicide Division's investigative file, and made no ruling with respect to the file maintained for this matter by the Philadelphia District Attorney's Office.

9

the purpose of making copies of relevant documents contained therein. This Court has not found precedent in our jurisdiction which specifically defines or provides factors to consider when determining whether "exceptional circumstances" exist to justify discovery in the PCRA context.

This Court heard lengthy argument on several occasions with respect to the discovery motion and PCRA counsel's basis for the motion, entertaining the Commonwealth's argument that the motion was overly broad and a mere "fishing expedition." Following proffers by PCRA counsel which led to findings by this Court that the Commonwealth had knowingly and deliberately withheld several documents and items of evidence which would have supported petitioner's theory of self-defense at trial, this Court ordered the Commonwealth to produce that evidence. At each occasion, the Commonwealth maintained that the evidence was not exculpatory within the meaning of Brady and that it had been under no obligation to furnish this evidence to the defense in pretrial discovery. When it became clear that the Commonwealth had exhibited a pattern of withholding evidence which should have been supplied in pretrial discovery, this Court found that exceptional circumstances had been established and ordered the production of the investigative file to the Court for the purpose of examining the file *in camera* in the presence of both PCRA counsel and counsel for the Commonwealth. For the following reasons, this Court's decision should be affirmed.

Pennsylvania Rule of Criminal Procedure 902(E) provides the general rule that discovery is not permitted within the context of a petition for relief under the PCRA. Pa.R.Crim.P. 902(E)(1). Unless the petitioner has received a sentence of death, a PCRA court may only order discovery during the proceedings "after a showing of exceptional circumstances."[18] Id. Neither the PCRA nor the Pennsylvania Rules of Criminal Procedure applicable to PCRA proceedings define "exceptional circumstances," instead, "it is for the [PCRA] court, in its discretion, to determine whether a case is

---

[18] In a first petition for post-conviction relief, where the petitioner has received a sentence of death, the Rule permits discovery upon a showing of the lesser "good cause" standard. Pa.R.Crim.P. 902(E)(2). Petitioner's case did not qualify for the "good cause" standard for discovery as he did not receive a sentence of death, as discussed *supra*.

10

exceptional and discovery is therefore warranted." Commonwealth v. Frey, 41 A.3d 605, 611 (Pa.Super. 2012) *citing* Commonwealth v. Dickerson, 900 A.2d 407, 412 (Pa.Super. 2006). Appellate courts will not disturb a PCRA court's finding with respect to the existence of exceptional circumstances unless the court has abused its discretion. Id., *citing* Commonwealth v. Lark, 746 A.2d 585, 591 (Pa. 2000). "An abuse of discretion is not a mere error in judgment... [i]nstead, it is a decision based on bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law." Id., *citing* Commonwealth v. Riley, 19 A.3d 1146, 1149 (Pa.Super. 2011). Here, the burden is on the Commonwealth to demonstrate that an abuse of discretion has occurred. Id., *citing* Commonwealth v. Bennett, 19 A.3d 541, 543 (Pa.Super. 2011) ("It is an appellant's burden to persuade [Superior Court] that the PCRA court erred and that relief is due.").

The mere speculation that exculpatory evidence may exist does not constitute an exceptional circumstance warranting discovery. Frey, 41 A.3d at 612, *citing* Dickerson, 900 A.2d at 412. However, just because a petitioner does not know for certain what a requested investigation file contains does not mean that the petitioner is improperly "fishing" for discovery; so long as the discovery requests are particular to specific documents based on a reasonable theory that those documents would contain evidence tending to support petitioner's theory for relief. Frey, 41 A.3d at 612-13. The Frey court found exceptional circumstances where the petitioner's discovery request was structured in such a fashion, and where the request was premised on a theory of the facts that cast doubts on the Commonwealth's presentation of the facts at trial. Id. at 608.

In Frey, the petitioner was convicted of murder of the first degree before the body of the decedent, Hopethan Johnson (Johnson), was actually found. Frey, 41 A.3d at 611. When the body of Johnson was discovered years later, forensic evidence arguably suggested that multiple persons were involved in the shooting death, which had not been part of the Commonwealth's prosecution theory or supported by the discovery materials to which the petitioner had had access at trial. Id.

11

This new evidence suggested a link between the murder of Johnson and the death of Stacy Farmer (Farmer), an associate of the petitioner who, while petitioner was in custody and awaiting charges, was found shot dead. Id. The evidence arguably suggested either a common killer or an accomplice of the petitioner to the murder of Johnson who had then committed the murder of Farmer. Id. Further, there were some indications within the record that police suspected the involvement of Farmer in the murder of Johnson, but did not investigate these suspicions when Farmer was found dead. Id. at 608.

The petitioner in Frey alleged in his PCRA petition that Johnson's killer, or an accomplice thereto, may have killed Farmer because he feared that Farmer was going to reveal facts which he knew about Johnson's death. Id. The petitioner in Frey filed a motion seeking discovery of police and ballistic reports, eyewitness statements, photographs, and autopsy reports regarding the death of Farmer, all of which he contended could demonstrate similarities between the murders of Farmer and Johnson and potentially indicate a common shooter. Frey, 41 A.3d at 608-9. The Frey court upheld the PCRA court's finding of exceptional circumstances, finding that the unusual facts of the case and the multiple indications that the two murders might be connected constituted exceptional circumstances. Id. at 612. Frey rejected the Commonwealth's arguments that discovery should not have been granted on the basis that the PCRA court had itself expressed skepticism about whether the petitioner's theory of the facts would ultimately prove to be true:

> [T]he court's expression of skepticism was accompanied by the court's rational analysis and conclusion that it was "certainly possible" than an unknown person who was involved in the Johnson murder later killed Farmer. This possibility, in the context of the somewhat uncommon case facts... led the court to conclude that this matter was an exceptional one.

Frey, 41 A.3d at 612.

Frey recognized that mere speculation that exculpatory evidence might exist did not constitute exceptional circumstances to warrant discovery, but maintained that the particular facts of the case suggested that information that supported the petitioner's theory might be in the

12

investigative files. Id. Therefore, "[i]t [was] not manifestly unreasonable to conclude that witness statements and/or other evidence contained in the Farmer investigative file would thus be relevant to the facts of the Johnson murder." Id. Frey found that the Commonwealth's characterization of the discovery request as a mere "fishing expedition" was unjustified:

The fact that Frey does not know for certain what the Farmer investigation file contains does not mean that he is improperly "fishing." Parties frequently do not know with certainty the contents of requested materials. Indeed, this lack of knowledge is often the main reason, though not the only possible reason, that discovery requests are made in criminal cases.

Frey, 41 A.3d at 612.

Reasoning that the petitioner had made particular requests for specific documents based on the reasonable theory that those documents may have contained evidence tending to show a common killer of Farmer and Johnson, and that the facts of record did suggest such a link, Frey held that the discovery request was not a baseless or speculative request properly described as a "fishing expedition." Id. at 612-13. Frey also noted that the question before the court was whether the PCRA court had abused its discretion in deciding to order discovery and not whether the petitioner deserved substantive relief, rejecting the Commonwealth's arguments based on the merits of the petitioner's claims. Id. at 613. Frey further found that the Commonwealth's briefing failed to demonstrate how granting the motion would result in detriment to the Commonwealth's interests, short of a cursory assertion that the search warrants on the Farmer case had been sealed. Id. Finding that the PCRA court had evaluated the facts and found exceptional circumstances based on the unusual case history and the reasonable belief that the grant of discovery would reveal evidence supporting one or more of the petitioner's PCRA theories, Frey ruled that the PCRA court had not abused its discretion and affirmed the grant of discovery. Id.

Here, this Court evaluated the facts and determined that this case involved exceptional circumstances—namely, the intense public attention with respect to the outcome of the gun battle, the sheer volume and complexity of the evidence collected, and this Court's finding that the

13

Commonwealth improperly withheld evidence which fairly supported petitioner's self-defense defense and supported a reasonable theory that unreleased contents of the file would reveal further evidence supporting petitioner's claims for relief. This Court found the Commonwealth's pattern of withholding evidence which tended to support petitioner's trial defense theory was particularly egregious and troubling in light of Judge Greenspan's having put the Commonwealth on notice *at the very beginning of petitioner's trial* that any information supporting self-defense should be treated as exculpatory, and having ordered ADA Gilson to furnish any such information to petitioner under threat of reversal:

> THE COURT: Let me tell you both, if there is any exculpatory evidence and that means anything that would give them either self-defense or voluntary manslaughter, anything that goes along that route, motive from the other side to shoot that day, then you better give it to [petitioner or trial counsel].
> MR. GILSON: Absolutely, understood. We will.
> THE COURT: Or this case will get reversed by me.
> MR. GILSON: It goes without saying we will provide any of that information, Your Honor.

N.T. 3/6/06 at 77.[19]

If evidence in the file sought by petitioner's discovery motion had been provided in discovery to trial counsel, petitioner may demonstrate that the failure to do so caused petitioner prejudice.

Further, this Court's findings that the Commonwealth withheld from pretrial discovery evidence potentially exculpatory to petitioner implicates the Commonwealth's obligations under Brady, and further supports a finding of exceptional circumstances.

---

[19] ADA Gilson testified that he had reviewed the Garraway memorandum in preparation for trial and that the memorandum was in the file made available to him before petitioner's trial began. N.T. 1/26/16 at 197-200. Despite Judge Greenspan's unambiguous directive, and in full knowledge that Judge Greenspan's order applied to evidence such as the Garraway memorandum, ADA Gilson chose to disregard her directive and to suppress the Garraway memorandum.

14

Brady v. Maryland, 373 U.S. 83, (1963), obliges a prosecutor to disclose "all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature." Commonwealth v. Chmiel, 30 A.3d 1111 (Pa. 2011).

It is important to emphasize that the disclosure requirements of Brady are not limited to purely exculpatory evidence; impeachment evidence also falls within Brady's parameters and must be disclosed by the Commonwealth. Commonwealth v. Antidormi, 84 A.3d 736, 747, (Pa.Super. 2014), *allocatur denied*, 95 A.3d 275 (Pa.2014); Commonwealth v. Herrick, 660 A.2d 51, 60 (Pa.Super. 1995)("Exculpatory evidence is evidence that is material to a determination of guilt or innocence or affects the credibility of key prosecution witnesses... [i]mpeachment evidence... does fall within the Brady rule... [m]oreover, evidence of fabrication is always exculpatory."). The obligation to disclose also "extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution." Id., *citing* Commonwealth v. Puksar, 951 A.2d 267, 281 (Pa. 2008). Moreover, the duty to disclose is "ongoing; information that may be deemed immaterial upon original examination may become important as the proceedings progress, and the [Commonwealth] would be obligated to release information material to the fairness of the trial." Pennsylvania v. Ritchie, 480 U.S. 39, 60 (1987).

Although substantive Brady claims are cognizable under the PCRA, Brady does not govern the scope of discovery under the PCRA. Commonwealth v. Williams, 86 A.3d 771, 788 (Pa. 2014). While the duty under Brady is both an affirmative and continuing duty upon the government, it establishes no specific right in the petitioner to review the Commonwealth's file to see if he agrees with the Commonwealth's representation that it has disclosed all materials to which the defense is entitled. Id. The right to discover exculpatory evidence does not include the unsupervised authority to search through the Commonwealth's files, and a defendant alone may not make the determination as to the materiality of the information. Id. However, an *in camera* inspection of the

15

Commonwealth's file may be warranted where there is reason to believe that evidence favorable to the defense will be revealed. Commonwealth v. Watson, 512 A.2d 1261, 1266 (Pa.Super. 1986), ("An in camera inspection of the Commonwealth's file is not required unless there is reason to believe that evidence favorable to the defense will be revealed."), *citing* Commonwealth v. Colson, 490 A.2d 811, 822 (Pa. 1985), *abrogated on other grounds by* Commonwealth v. Burke, 781 A.2d 1136 (Pa. 2001).

To establish a Brady violation, a petitioner must prove three elements: 1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; 2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and, 3) prejudice ensued. Chmiel, 30 A.3d at 1129-30. While the question before this Court on the discovery request was whether exceptional circumstances were present, it is important to recognize the substance and contours of the underlying merits when considering the propriety of a discovery request. Frey, 41 A.3d at 613.

Here, this Court found exceptional circumstances in part due to findings that the Commonwealth had improperly withheld from the defense evidence otherwise required to be provided in pretrial discovery, including: 1) the statement of Rafi Smith made to David Garroway; and, 2) the forensic evidence and testing done on the pair of vehicles which were believed to have been involved in the gun battle.

The first component of a Brady violation requires that the evidence at issue is favorable to the accused because it is either exculpatory or impeaching. Chmiel, 30 A.3d at 1129. With respect to the instant case, evidence would have been favorable or exculpatory to petitioner, and therefore required for disclosure by the Commonwealth, if it tended to support petitioner's trial defense of self-defense or tended to impeach the credibility of witnesses offered against him. As petitioner was charged with first-degree murder, a successful self-defense defense would have resulted in either an

16

acquittal or a conviction of voluntary manslaughter for so-called "imperfect self-defense." Commonwealth v. Sepulveda, 55 A.3d 1108, 1124-25 (Pa. 2012). To prevail on such a defense, there must be evidence that the petitioner "(a) reasonably believed he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the [petitioner] was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the [petitioner] did not violate any duty to retreat." Id., *citing* Commonwealth v. Samuel, 590 A.2d 1245, 1247-48 (Pa. 1991). For the derivative and lesser defense of imperfect self-defense, there must be evidence that the petitioner's belief that deadly force was necessary was unreasonable rather than reasonable, and all other principles of justification must be satisfied. Id. at 1124. Therefore, any evidence having any bearing on the reasonableness of petitioner's belief in imminent danger of death or bodily injury, whether the Broaster group was the aggressor in the gun battle, or whether petitioner retreated, would be Brady material requiring disclosure.

The second component of a Brady violation requires that the evidence at issue be suppressed by the government, either willfully or inadvertently. Chmiel, 30 A.3d at 1129-30. Evidence, whether in the possession of the prosecution or the police, is subject to the Brady duty to disclose. In order to comply with Brady, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995). For over a decade, our Supreme Court has endorsed that same principle. Burke, 781 A.2d at 1142 n.5 (finding it immaterial that a prosecutor was unaware of relevant statements in police files, given that "[t]his Court cannot ignore the obvious implications of Kyles."); Commonwealth v. Gibson, 951 A.2d 1110, 1127 (Pa. 2008) ("The prosecution's duty under Brady incorporates disclosure of all exculpatory evidence, regardless of

17

whether the defense specifically requests such materials, and extends to evidence in the possession of police agencies of the same government bringing the prosecution.") (internal citations omitted).[20]

At the January 26, 2016 evidentiary hearing, this Court asked for ADA Gilson to explain the context of Rafi Smith's statement to David Garroway and Gilson's reasons for failing to provide this to the defense. N.T. 1/26/16 at 186-210. After the gun battle, Rafi Smith was arrested and his case was taken over by federal authorities. Id. at 194. While in federal custody, Smith was interviewed by federal intelligence officer David Garraway. Id. Mr. Garraway prepared a memorandum (Garraway memorandum) of his interview with Smith, noting that Smith also spoke to Homicide detectives. Id., Exhibit P-9. The Garraway memorandum was located in the Homicide Division's investigation file. Id. at 198. The Garraway memorandum states that Smith told Garraway the following: that, on the day of the gun battle, petitioner told Smith that they were waiting for Smith to drop off his children at Pierce Elementary School so that they could then buy marijuana. Id. 1/26/16 at 209-10. While waiting, Jerome Broaster, his child, and the child's mother arrived in a car at the school, and the mother exited the vehicle to drop off her child. Id. An argument between petitioner and Broaster then ensued, and petitioner started to walk away, after which Broaster fired shots at petitioner. Id. ADA Gilson testified that, although the Garraway memorandum indicated that Rafi Smith told Garraway he had been interviewed by Philadelphia Homicide detectives, ADA Gilson never located any record or statement of Rafi Smith to the Philadelphia Police Department. Id. at 203. ADA Gilson indicated that Smith may have in fact been interviewed by Homicide detectives,

---

[20] There is no dispute that the Philadelphia District Attorney's Office and the Philadelphia Police Department are part of the "same government." Rafi Smith's statement to David Garroway, though made in the context of a federal investigation, was supplied to the Philadelphia Police Department and the Commonwealth conceded that this statement was in its file at the time of trial. N.T. 1/8/16 at 30. The forensic evidence and testing collected from two vehicles which were suspected to be involved in the gun battle was performed by the Philadelphia Police Department and requested by the defense in pretrial discovery, but the defense was only provided with the property receipts for these two vehicles. N.T. 8/14/15 at 61-67. Under Kyles and Burke, all of this evidence is properly considered to be within the scope of the prosecutor's control.

18

but that that was perhaps not documented in their files because Smith provided no helpful information. Id. at 205. ADA Gilson testified that he reviewed the Garraway memorandum and did not believe it was discoverable, and that this was the reason that the Garraway memorandum was not disclosed to the defense in pretrial discovery. Id. at 202. ADA Gilson claimed that he did not consider the information in the Garraway memorandum to be exculpatory because it "put[] [petitioner] at the scene"[21] and because the statement was inadmissible hearsay. Id. at 210-12.

As discussed *supra*, the meaning of "exculpatory" for Brady purposes is not so limited as to only include that evidence which indicates that a defendant was never present at the crime scene. Because petitioner's trial defense theory was self-defense, *any* evidence which tended to support this theory should have been disclosed. Even if this evidence only sufficed to establish an imperfect self-defense, it was material to petitioner's charge of murder in the first degree. At the hearing, ADA Gilson dismissed the possibility that this evidence could have prompted any defense investigation which would have revealed admissible evidence. N.T. 1/26/16 at 211. This Court concluded that ADA Gilson's assessment of what was exculpatory in this case, and his position that this statement could not have lead to the discovery of any admissible evidence, was incorrect and an improper basis for willfully withholding evidence which should have fairly been provided to the defense in pretrial discovery, particularly after specifically being ordered to do so by Judge Greenspan. ADA Gilson, a thorough prosecutor with many years of experience, knew better. When viewed in the context of the assurances he mouthed to Judge Greenspan, knowing that this document was in his file, this conduct reflects a brash disdain for a prosecutor's duty of candor to the tribunal.

Months before the January 26, 2016 evidentiary hearing where ADA Gilson testified about the Rafi Smith statement, this Court had heard argument on petitioner's discovery motion with

---

[21] But surely ADA Gilson is well versed in the notion that a defendant advancing a defense of self-defense is *admitting* he committed the shooting – in other words, that he was present.

respect to a pair of automobiles, both of which were processed by police. Each car was suspected to have been the car used by the Broasters in the gun battle. See N.T. 7/2/15 at 53-58; N.T. 8/14/15 at 58-68. Petitioner had asserted that the Broasters chased him and fired at him from a car, and that evidence supporting this position would have helped his self-defense theory to prevail at trial. At the hearing on July 2, 2015, PCRA counsel asserted that trial counsel had been provided with two property receipts, one for a car matching the description of the car used by the Broasters in the gun battle with four bullet holes in the windshield, discovered near the crime scene within an hour of the shooting. N.T. 7/2/16 at 54. Counsel also described a car registered to Cassius Broaster, recovered with a single bullet hole in the windshield, which was indicated by the second property receipt. Id. at 55-56. At the August 14, 2015 hearing, PCRA counsel had asserted that the only evidence which was disclosed to trial counsel with respect to these two vehicles was the police reports[22] and property receipts indicating that the vehicles were seized by police and ballistics testing was performed, while information with respect to any forensic evidence, owner's information, or the results of any ballistics testing was not provided to the defense. N.T. 8/14/15 at 60-62. This Court found that this information should also have been turned over to the defense in pretrial discovery, as any ballistics evidence from these vehicles could have contradicted the Commonwealth's presentation of facts at trial and supported petitioner's self-defense theory at trial. Id. at 59-68.

In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment *irrespective of the good faith or bad faith of the prosecution.*" Brady, 373 U.S. at 87 (emphasis added). Though the prosecutor's intent is unimportant in a pure Brady analysis, Pennsylvania courts have found that prosecutorial "gamesmanship" amounting to a violation of

_____

[22] PCRA counsel represented that the only information in these police reports were references that the cars were "taken by police to a police place" and that ballistics evidence was found inside the cars. N.T. 8/14/15 at 62.

20

discovery rules can be an independent reason to shape a remedy for a defendant where such gamesmanship prejudices the defendant in his ability to present a defense. Commonwealth v. Moose, 602 A.2d 1265, 1273-75 (Pa. 1992) (finding that where the prosecutor hid a statement from defense counsel and told the court that "all available evidence had been provided" required that a new trial be granted because it prejudiced the defendant and, otherwise, the court "would be condoning and encouraging such last minute disclosures and gamesmanship.").[23]

The third and final component of a Brady violation requires that prejudice ensued from the prosecution's suppression of favorable evidence. Chmiel, 30 A.3d at 1129-30. "Prejudice" in this context is defined by the concept of "materiality." For suppressed evidence to be considered "material," there must be a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Cone v. Bell, 556 U.S. 449, 470 (2009), *citing* Kyles, 514 U.S. at 435.

When undertaking the "materiality" analysis, the court in Kyles indicated that materiality is to be judged by reference to the "suppressed evidence considered collectively, not item-by-item" with the focus on the "cumulative effect of suppression." Kyles, 514 U.S. at 437. Practically, courts analyze the "cumulative effect of suppression" through two inquiries: whether suppression negatively impacted the defense's case, and whether the government took advantage of the fact that evidence favorable to the accused was withheld.

In U.S. v. Perdomo, the Third Circuit measured the impact of suppression on the defense's case by considering the "possible effects of non-disclosure on the defense's trial preparation," and by asking whether, had that evidence been "*disclosed and used effectively*, it may make the difference between conviction and acquittal." 929 F.2d 967, 971-72 (3d Cir. 1991) (emphasis in original). In

---

[23] The Moose court relied on Commonwealth v. Thiel, 470 A.2d 145, 149 (Pa.Super. 1983), where the Superior Court fashioned a remedy for a defendant after the government withheld information that should have been disclosed under Pa.R.Crim.P. 305(B)(1)(f).

that case, the government unknowingly misrepresented to the defense that its key witness did not have a criminal history, despite that witness in fact having two prior convictions. Id. at 970-72. "Such information would have been critical in presenting the witness' mental state, demeanor and behavior to the jury, and in questioning the witness' credibility." Id. at 972. The Perdomo court stressed that the impact of suppression on the testimony that the defense "would have been able to elicit" was magnified by the government's misrepresentation, which misleadingly induced defense counsel into believing that the witness could not be impeached. Id. The cumulative impact of suppression presented an "undisputable argument that a Brady violation occurred." Id. at 974.

While the Perdomo court tackled the "materiality" question from the perspective of how suppression impacted the defense's case, other cases have emphasized that evidence is more likely to be considered "material" when the government seizes upon and exploits the presence (or absence) of the suppressed evidence. The Kyles court, for example, considered the "word of the prosecutor" relevant to the materiality computation. The United States Supreme Court found impeachment evidence of two witnesses to be material in part because that evidence contradicted the argument set forth by the prosecutor during closing arguments. Kyles, 514 U.S. at 444 ("The likely damage is best understood by taking the word of the prosecutor, who contended during closing arguments that Smallwood and Williams were the State's two best witnesses.").

When this Court granted the discovery requests with respect to the Garraway memorandum regarding Rafi Smith and the evidence collected from the automobiles, it was cognizant of the Commonwealth's comments during closing arguments at petitioner's trial which the withheld evidence tended to contradict.[24] ADA Gilson's assurance to Judge Greenspan's admonition that any

---

[24] With respect to the evidence collected from the cars and petitioner's theory that the Broasters had pursued petitioner and fired at him from their cars, the Commonwealth asserted in closing arguments that: the only shots fired by the Broasters were the five cartridge cases recovered from the street (N.T. 3/15/06 at 190); that petitioner and co-defendant Spady had traveled up the block for the purposes of luring the Broasters into an inferior firing position rather than to retreat (Id. at 191); and that the Broasters had entered their cars for the purposes of fleeing petitioner and Spady rather than to pursue (Id. at 196). With respect to the Garraway memorandum describing Rafi Smith's statement supporting

22

evidence tending to support self-defense would be supplied to trial counsel therefore denotes a willful and flagrant scorning of the trial court's orders.[25]

This Court also considered the facts of this case as an unusually complex first-degree murder case with dense volumes of evidence collected, heavy public attention and pressure on the Commonwealth to bring the case to a resolution, and restrictions on which discovery materials could be provided to the petitioner out of a concern that petitioner would intimidate witnesses.[26] This Court considered the occasions where it found that evidence was improperly withheld from pretrial discovery, which supported a reasonable belief that other, non-disclosed documents within the Homicide Division file would support petitioner's PCRA theories. Finally, this Court found that there would be no relative detriment to the Commonwealth by granting petitioner's discovery request, as the investigation in this case has been concluded for several years.

Therefore, in keeping with the guidance provided in Frey, this Court found that the facts of this case and the Commonwealth's pattern of withholding items of evidence that supported petitioner's trial defense theory of self-defense were exceptional circumstances and therefore granted petitioner's request for discovery of the Homicide Division file in its entirety. The Commonwealth has not presented an explanation for how detriment might result, other than to characterize this as a "fishing expedition" and to assert that this would only further delay resolution of a petition for PCRA relief that has lingered for years. In order to settle the issues in this matter expeditiously rather than piecemeal, and in light of the extraordinary circumstances presented at arguments, this Court directed the Commonwealth to provide the Homicide file to this Court's chambers for the

---

that the Broasters initiated both the argument and the gun battle, the Commonwealth asserted in closing arguments that: petitioner and co-defendant Spady traveled to Pierce Elementary for the express purpose of killing Cassius Broaster in revenge (Id. at 200); and that petitioner and Spady hid their weapons under their clothing and initiated arguments with the Broasters for the purpose of provoking them into firing first (Id. at 206).

[25] See N.T. 3/6/06 at 77.

[26] See N.T. 7/2/15 at 98-9.

purposes of reviewing the materials and determining whether any materials withheld from the defense support one or more of petitioner's PCRA theories for relief. This Court thus did not err in granting petitioner's motion for discovery of the Homicide Division's investigation file.

For the foregoing reasons, this Court's order should be affirmed.

BY THE COURT:

_M. Teresa Sarmina_
M. TERESA SARMINA          J.

24